AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Missouri

| In the Matter of the Search of | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100023956283136; FACEBOOK USER ID 100002876094961; AND FACEBOOK USER ID 100043266096006 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No.   4:21 MJ 1362 JMB <br><br> SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I, S. Matthew Baughn _____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A

located in the _____ District of _____CALIFORNIA_____ , there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:2119; | Carjacking; |
| 18:924(c) | possession of a firearm in furtherance of a crime of violence |
| 18:922(j) | possession of a stolen firearm |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct.

_____
*Applicant's signature*

Special Agent S. Matthew Baughn, FBI
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: ___10/01/2021___

_____
*Judge's signature*

City and state: St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

AUSA:  C. Ryan Finlen, #63059181L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID 100023956283136;
FACEBOOK USER ID 100002876094961;
AND FACEBOOK USER ID
100043266096006 THAT IS STORED AT
PREMISES CONTROLLED BY
FACEBOOK INC.

Case No. 4:21 MJ 1362 JMB

**Filed Under Seal**

SIGNED AND SUBMITTED TO THE COURT FOR
FILING BY RELIABLE ELECTRONIC MEANS

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, S. Matthew Baughn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for
information associated with a certain Facebook user IDs that are stored at premises owned,
maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company
headquartered in Menlo Park, California. The information to be searched is described in the
following paragraphs and in Attachment A. This affidavit is made in support of an application for
a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require
Facebook to disclose to the government records and other information in its possession, pertaining
to the subscriber or customer associated with each user ID.

2.      I am an investigative or law enforcement officer of the United States. I have been
employed as a Special Agent of the FBI since 2010. I am currently assigned to a squad responsible
for the investigation of crimes of violence. Through my training and experience, I am familiar with
the debriefing of cooperating witnesses and/or other sources of information and methods of

searching locations where firearms, instruments of money laundering, stolen merchandise, and evidence of other crimes may be found. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      In my role as a Special Agent with the FBI, I have utilized investigation techniques involving the tracking of suspects engaged in criminal activity through investigation of their internet activity, cellular phone activity, and social media activity. I have received at least annual training on the tools used by suspects engaged in criminal activity to document and further that criminal activity. Furthermore, I have applied for, received, and executed search warrant for social media materials in furtherance of criminal investigations. I have also assisted fellow law enforcement agents in doing the same as part of my regular activities as a Special Agent with the FBI.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2119 (carjacking); and Title 18, United States Code, Section 924(c) (use of a firearm in furtherance of a crime of violence); and Title 18, United States Code, Section 922(j) (possession of a stolen firearm that had been shipped in interstate commerce); have been committed by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON. There is also probable cause to search

2

the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATION TO BE SEARCHED

7.      The locations to be searched are:

**A.** Facebook ID 100023956283136 (URL Facebook.com/benny.low.98031) (hereinafter referred to as "Eldiablo Son Account") located at 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

**B.** Facebook ID 100002876094961 (URL Facebook.com/luhmella) (hereinafter referred to as "Caydo Loc Account") located at 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

**C.** Facebook ID 100043266096006 (URL Facebook.com/khali.buckahknot) (hereinafter referred to as "Kaliyah Buckos Account") located at 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

3

## **BACKGROUND ON FACEBOOK**

8.     From my consultations with personnel familiar with stored electronic communications, and my own training, experience and knowledge, I am aware that:

a.  The Internet is in part a computer communications network using interstate and foreign telephone and communication lines to transmit data streams, including data streams used to provide a means of communication from one computer to another and used to store, transfer and receive data and image files.

b.  An "Internet Protocol" (IP) address is a unique series of numbers, separated by a period, that identifies each computer using, or connected to, the Internet over a network. An IP address permits a computer (or other digital device) to communicate with other devices via the Internet. The IP addresses aids in identifying the location of digital devices that are connected to the Internet so that they can be differentiated from other devices. As a mailing address allows a sender to mail a letter, a remote computer uses an IP address to communicate with other computers.

c.  An "Internet Service Provider" (ISP) is an entity that provides access to the Internet to its subscribers.

d.  The term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

9.     Facebook is a business and company that operates as a remote computing service, a provider of electronic communications services through ISPs. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and

4

users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public. Services offered by Facebook are diverse and include the operation of a free, internet-based social media and networking site. Users create their own profile pages, which can include personal information, lists of personal interests, photographs, videos, and messages. Once an account is created a Facebook user can invite and 'add' friends to their Facebook account, and links to pages within and outside the Facebook environment. Facebook also permits users to send and receive private messages (the functional equivalent of e-mails) with other Facebook users, and to restrict the disclosure of certain information (profile information, photos, messages, videos and other content) exclusively to the selected groups of individuals such as Facebook "friends" of their choosing.

10.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook asks users to provide basic identity and contact information to Facebook, either during the registration process or thereafter. Facebook also assigns a user identification number to each account. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Each user profile page includes a list of that user's "friends," along with links to the friends'

5

profiles pages. Facebook users can adjust the privacy settings for their profile so that their profile information is visible only to their Facebook "friends," rather than to the public (which is the default setting).

11.     For each user, Facebook retains information about the date and time at which the user's profile was created, the date and time at which the account was created, and the IP address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Facebook account. For a given user, Facebook retains the basic identity information entered by the user, all data displayed on the user's profile, and all stored files (such as images and videos) contained in the user's account as long as the user has not edited the data or removed the files from the profile. When a given Facebook account is deleted, Facebook retains certain information relating to that account for some period of time, including user identity information, IP logs, and other data. Even if a given user deletes data, Facebook stores such data for extended periods of time on Facebook's servers. Facebook typically retains additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).

12.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

6

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

13.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information in the user's account available only to himself or herself, to other specified Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

14.     Facebook also keeps internet protocol (IP) logs for each user. These logs contain information about the user's log-ins to Facebook, including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile. Facebook retains IP log information about each account access for at least ninety days; however, in some instances the data may be retained for longer or shorter periods of time.

15.     Facebook users can exchange private mail messages with other users via Facebook. A given private message typically includes the Facebook user name of the sender and the recipient of the message, a subject line, the actual content of the message, and a date stamp reflecting when the message was sent. Private messages are sent to the recipient's Facebook inbox and remain available until the user removes them. A user's sent messages are stored in a 'sent box' for that user on Facebook.

7

16.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and creator of the group. Facebook also assigns a group identification number to each group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and administrator, as well as the current status of the group profile page.

18.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

19.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

8

20.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

22.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

23.     Facebook users can add a variety of information to their profiles, including photographs, videos, music and other audio files, lists of personal interests and preferences, journals or web logs ('blogs'), bulletins, news feeds, links to other locations on the Internet, which typically contain personal information about the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles. Facebook allows users to edit or

delete comments on their own profile pages, and users can adjust their profile settings to allow them to pre-approve comments on their own profile pages.

24.     In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems or complaints. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

25.     Messages, photos, audio videos, and other records stored on Facebook server by a subscriber may not necessarily be located in the subscriber's home/work computer. The subscriber or user may store data on Facebook servers for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer at his/her residence or employment. A search of the files in the computer at the subscriber's residence or place of employment will not necessarily uncover the files that the subscriber has stored on the Facebook server. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

26.     It is common for individuals involved in criminal offense offenses to communicate with one another through Facebook and other online social media e-mail methods. Such communication includes discussions concerning planning, operations, intelligence gathering and dissemination, the transfer of critical information, the staging of videos, the identification and photos of money and contraband gained from criminal activities, and the identification of other associates and co-conspirators.

27.     From my knowledge, training and experience, as well as discussions I have had with other agents and personnel familiar with computer-related investigations, I know that it is common for individuals engaged in the criminal activities described herein to use websites, social networking sites, and other internet-based applications to communicate with one another and facilitate their criminal activities. Such communications and the facilitation of criminal activities include the use of these applications and electronic and stored data that would identify and describe:  (a) other co-conspirators, aiders, and abettors who are participating in the illegal activities as well as the nature and scope of the illegal activities; (b) identify dates and locations where illegal activity has taken place or may take place in the future; (c) financial transactions and monetary transfers used to facilitate and continue criminal activities as well as the existence and location of records, bank accounts, and businesses pertaining to those activities;  (d) sales and purchases of equipment, materials, and goods used to aid the co-conspirators in their endeavors as well as the location and use of assets accumulated; (e) travel, safe-houses, and locations where goods, materials and personnel stay or are kept; and, (f) the existence of other communication facilities, including telephones, computers, e-mail and other electronic accounts used to by co-conspirators to communicate.

28.     By its very nature, websites, social networking accounts, and internet-based applications described herein are kept and stored in computers and electronic-memory devices by the host companies, in addition to or in lieu of hard-copy versions of this data. Because such evidence is stored electronically, the data and evidence of the crimes described herein may be stored and be present for long periods of time.

29.     In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from

other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the

Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

32.     As described earlier in this affidavit, it is common for individuals involved in these activities and criminal offenses to communicate with one another through online methods such as Facebook and other online sources. Such communication includes discussions concerning planning, operations, the transfer of information, drugs, firearms and money, and the identification of other associates and co-conspirators. As is apparent this enables individuals to share photographs, videos, documents, files, and information. Online social media sites such as Facebook allow individuals to communicate and disseminate information to numerous individuals at one time, such as "Friends" and "Groups." Postings and sharing information can quickly reach large audiences in an efficient manner. Facebook in particular also allows users to have private discussions, messages, and communications that may otherwise not be possible.

33.     By August 27, 2021, a member of my investigation team requested that Facebook preserve all data with respect to the accounts for which your affiant seeks authority to search.

13

## PROBABLE CAUSE

June 12, 2021 – SCCY Firearm Theft

34.     On the night of June 12, 2021, Victim W.H. reported to police that he had picked up Kaley M. FRIZIELLIE at a residence earlier that day. Victim W.H. drove with FRIZIELLIE to the Quiktrip gas station, located at 2791 Dunn Road, St. Louis, Missouri. Victim W.H. reported that he walked into the store, leaving FRIZIELLIE in his vehicle, with the vehicle running. When Victim W.H. exited, FRIZIELLIE and his vehicle were gone. Within his vehicle was Victim W.H.'s black and silver SCCY 9-millimeter semi-automatic pistol, bearing serial number 157904. The stolen vehicle was recovered by a patrol officer within a couple hours at the Knights Inn, located within a mile from the gas station. The motel employee searched the motel's computer records and determined that FRIZIELLIE was not a guest of the motel at the time but had stayed at the hotel in the past.

35.     On August 23, 2021, police officers in the City of St. Louis stopped FRIZIELLIE for driving recklessly by weaving through traffic, changing lanes without a turn signal, and failing to make complete stops at stop signs, and driving without front or rear license plates. During the stop, FRIZIELLIE drove away from the officer at a high rate of speed. Police were able to maintain surveillance of FRIZIELLIE and eventually stopped her vehicle by disabling the tires. Once her vehicle came to rest, FRIZIELLIE fled on foot with a silver over black firearm in her right hand. As FRIZIELLIE continued to flee, FRIZIELLIE dropped the silver over black firearm, which was the same black and silver SCCY 9-millimeter semi-automatic pistol, bearing serial number 157904, that was stolen from victim W.H. on June 12, 2021.

36.     After FRIZIELLIE consented on August 23, 2021, to the search of her cellular phone, investigators discovered that FRIZIELLIE recorded two videos on her cellular phone

14

earlier on August 23, 2021. Both videos are less than 50 seconds in length and depicted FRIZIELLIE wearing the same mustard-colored jacket FRIZIELLIE wore at the time of her arrest. In the first video, FRIZIELLIE is holding a semi-automatic handgun with a drum-style extended-capacity magazine inserted into the magazine receiver. The second video depicted FRIZIELLIE with the same firearm from the first video in one hand and a second handgun in her other hand. The second handgun is a silver over black semi-automatic with a transparent or translucent extended-capacity magazine. Apart from the detachable extended-capacity magazine, the silver and black handgun is not inconsistent with the black and silver SCCY 9-millimeter semi-automatic pistol, bearing serial number 157904 recovered during FRIZIELLIE's arrest.

37.     On August 22, 2021, the day before FRIZIELLIE's arrest, FRIZIELLIE's phone received a text message from 314-379-9925 (the same number provided to FRIZIELLIE by the Eldiablo Son Account on May 2, 2021). That message asked, "U tryna sell that clip or the drum." Based on my training and experience, I know that a "clip" is a slang term for a firearm's magazine and a "drum" is a term used to describe a drum-style, extended-capacity firearm magazine.

Linking TURNER, HOUSTON, and FRIZIELLIE to their respective Facebook Accounts

38.     During the search of FRIZIELLIE's phone, investigators discovered that FRIZIELLIE's call log included communications through Facebook Messenger service. Facebook Messenger service identified messages made by the account using FRIZILLIE's phone or received by the account using FRIZIELLIE's phone to be the "owner" account. That account was the Kaliyah Buckos Account, which was assigned Facebook ID 100043266096006.

39.     FRIZIELLIE's phone also contacted other Facebook accounts via the Facebook Messenger service, including seven communications with the Eldiablo Son Account on May 21, 2021. FRIZIELLIE's phone indicated that the Eldiablo Son Account was assigned Facebook ID

100023956283136. In addition to these communications, FRIZIELLIE's phone also recorded chats between the Eldiablo Son Account (Facebook ID 100023956283136) and the Kaliyah Buckos Account (Facebook ID 100043266096006). Those chats included an exchange where, on April 26, 2021, the Eldiablo Son Account messaged the Kaliyah Buckos Account with "Call me." On May 2, 2021, the Kaliyah Buckos Account responded with "How u gone tell me call u but don't got my line." The Eldiablo Son Account replied within an hour with "On hear or 3143799925," indicating that the user of the Kaliyah Buckos Account could use Facebook Messenger to contact the user of the Eldiablo Son Account or by calling the user of the Eldiablo Son Account at telephone number (314) 379-9925. Records provided by Facebook indicate that the Eldiablo Son Account was available at URL Facebook.com/benny.low.98031.

40.     Within the contacts stored electronically in FRIZIELLIE's phone was an entry under the name "Caydo Loc." The source listed for that contact was Facebook Messenger, and identified Facebook ID 100002876094961 as corresponding to Caydo Loc with username, "caydoloc." Additionally, FRIZIELLIE's phone included stored password information for Facebook ID 100002876094961, indicating that FRIZIELLIE's phone had been used to access Facebook ID 100002876094961. The stored password information identified Facebook ID 100002876094961 with the full name of "Caydo Loc" with the email account associated with the account as "houstoncailin@yahoo.com." Public records searches revealed that the Caydo Loc Account lists its vanity name as "Caydo Loc" and is available at URL Facebook.com/luhmella.

June 14, 2021 - Carjacking and Robbery

41.     On June 14, 2021, at approximately 12:18 a.m., Male Victim C.J. was robbed inside a room at the Budget Inn Motel located at 1405 Dunn Road, Florissant, Missouri, within the Eastern District of Missouri. Victim C.J. stated to law enforcement that he met a female on a

16

website called skipthegames.com and agreed to meet her at the motel for the purpose of engaging

in a commercial sex act. Male Victim C.J. described the female as a light skinned black female

with blue hair and multiple tattoos (Suspect 1). Suspect 1 arrived in a small silver BMW and told

Male Victim C.J. to rent a room. Male Victim C.J. and Suspect 1 then went to room 114 and the

Subject 1 took a shower. Then they began to "hang out" on the bed, according to Male Victim C.J.

Male Victim C.J. also provided law enforcement with his full, ten-digit cellular phone number,

which ends in 007 (hereinafter XXX-XXX-X007).

42.     At some point on June 14, 2021, Suspect 1 told Male Victim C.J. she left something

in her vehicle outside and left the room briefly. Shortly after leaving, Suspect 1 returned to the

room accompanied by a black male, approximately 5'5, 130lbs with a ski mask over his face

(Suspect 2). According to Male Victim C.J., both Suspect 1 and Suspect 2 were armed with black

pistols. Suspect 2 approached Male Victim C.J. and struck him in the face with the handgun.

Suspect 2 then told Male Victim C.J. to lay down on the bed face down. According to Male Victim

C.J., the two suspects demanded money and personal property from Male Victim C.J., including

the keys to Male Victim C.J.'s vehicle. Suspect 1 and Suspect 2 then took Male Victim C.J.'s

clothes, cell phone, car keys, and wallet from the room and left. Male Victim C.J.'s vehicle was

identified as a 2012 black Honda Civic.

43.     A witness at the hotel stated he observed most of the incident through his motel

room window. The witness advised he observed Suspect 1 and Male Victim C.J. walk to their

room directly below his room. Shortly after, he observed Suspect 1 run out of the room and call

out "baby come on!" to Suspect 2 who appeared from elsewhere in the parking lot wearing a ski

mask. Shortly after, the witness observed Suspect 1 and Suspect 2 run out of Male Victim C.J.'s

motel room. Suspect 1 got in a silver BMW. Suspect 2 dropped his firearm on the ground, stopped

17

to pick it up, then got into the driver's seat of Male Victim C.J.'s vehicle. Both drove out of the Budget Inn's parking lot at a high rate of speed.

44.     Text Now, a cellular service provider, provided records pertaining to phone number 314-476-3409, the phone number used by FRIZIELLIE between at least as early as June 2, 2021, and August 23, 2021. Text now records show that the same phone number (XXX-XXX-X007) provided by Male Victim C.J. exchanged communications (phone calls, text messages, etc.) with FRIZIELLIE'S phone number 314-476-3409 on June 13 and 14, 2021. Specifically, the two phones connected at the following times in the following manner:

| Contact Type (Text/Call) | Date and Time (Start Time for Calls)[1] | Duration (Calls Only in Seconds) | Initiating Phone | Receiving Phone |
|---|---|---|---|---|
| Text | 2021-06-14 00:10:16 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:43:51 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:45:35 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:45:57 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:47:08 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:47:29 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:47:33 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:47:41 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:47:53 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:47:59 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:48:06 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:48:15 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:48:18 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:48:28 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:48:43 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:48:59 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 00:49:13 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 00:50:53 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 01:09:09 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 01:51:45 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 01:55:34 UTC | | 314-476-3409 | XXX-XXX-X007 |

---

[1] The dates and times are provided in Coordinated Universal Time (UTC), which was five hours ahead of Central Time. To determine the Central Time, convert by simply subtracting five hours.

18

| Contact Type (Text/Call) | Date and Time (Start Time for Calls)[1] | Duration (Calls Only in Seconds) | Initiating Phone | Receiving Phone |
|---|---|---|---|---|
| Call | 2021-06-14 01:55:48 UTC | 43 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 02:05:30 UTC | 14 | XXX-XXX-X007 | 314-476-3409 |
| Call | 2021-06-14 02:06:14 UTC | 35 | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 02:07:26 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 02:09:00 UTC | | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 02:15:27 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Call | 2021-06-14 02:15:40 UTC | 67 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 02:25:55 UTC | 58 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 02:28:25 UTC | 15 | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 02:29:00 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 02:30:26 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Text | 2021-06-14 02:46:24 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Call | 2021-06-14 02:57:58 UTC | 100 | 314-476-3409 | XXX-XXX-X007 |
| Text | 2021-06-14 03:04:43 UTC | | XXX-XXX-X007 | 314-476-3409 |
| Call | 2021-06-14 03:05:12 UTC | 67 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 03:30:15 UTC | 64 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 03:36:22 UTC | 16 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 03:36:58 UTC | 75 | 314-476-3409 | XXX-XXX-X007 |
| Call | 2021-06-14 03:40:21 UTC | 121 | XXX-XXX-X007 | 314-476-3409 |

45.     After June 13, 2021, at approximately 10:40 Central Time, Male Victim C.J. did not have any telephonic communication with FRIZIELLIE's phone.

46.     On August 24, 2021, law enforcement interviewed FRIZIELLIE while she was in custody at the St. Louis County Police Department (SLCPD). FRIZIELLIE was advised of her rights and agreed to talk to SLCPD and the FBI.

47.     FRIZIELLIE relayed the following account of the June 14, 2021, robbery:

a.      FRIZIELLIE met someone on a website called skipthegames.com and arranged to meet them at the Budget Inn Motel on Dunn Road in North St. Louis County.

b.      FRIZIELLIE and her pimp "Debo" arrived at the motel in a stolen BMW.

c.      FRIZIELLIE had sex with the man, who paid her $150. However, Debo wanted FRIZIELLIE to get more than $150. When FRIZIELLIE told Debo the man

19

did not give her more than $150, Debo got out of the car and went into the man's

room and robbed him.

d.   Debo pulled a gun on the man and hit him with it. FRIZIELLIE told Debo to stop

hitting the man.

e.   Then, Debo made him take off all his clothes and took his car keys. Debo made

FRIZIELLIE drive one of the two vehicles back to an address on Prince Drive in

Castle Point, Missouri. When they arrived, Debo beat FRIZIELLIE for not getting

enough money.

f.   As of the August 24, 2021, interview, FRIZIELLIE believed Debo still had the

victim's vehicle.

48.   FRIZIELLIE was shown a photograph of DEMOND TURNER and identified him

as Debo. She was also shown a photograph from the Eldiablo Son Account and identified it as

TURNER's Facebook page. FRIZIELLIE further advised that TURNER used Facebook

Messenger to communicate with her and others about her prostitution and stolen vehicle.

49.   The publicly available profile photograph for the Eldiablo Son Account is the

following:



Further, the Eldiablo Son Account also posted an image on or about October 2019 of, what appears to be, the same male depicted in the profile photograph. In that image, the male is holding what appears to be a Sig Sauer Model P320 as seen below:



That male, who FRIZIELLIE identified as TURNER, also appears to be the same individual in TURNER's August 25, 2021, booking photograph following his arrest in St. Louis County, as depicted below:



21

50.     FRIZIELLIE consented to allow law enforcement to search the contents of the phone she had in her possession when she was arrested. Within FRIZIELLIE's phone, investigators discovered that the Eldiablo Son Account began exchanging messages with FRIZIELLIE through FRIZIELLIE's Facebook account, the Kaliyah Buckos Account, beginning around March 14, 2021. On April 26, 2021, the Eldiablo Son Account sent the Kaliyah Buckos Account a message that read, "Call me." The Kaliyah Buckos Account responded by asking how she would be able to call, and the Eldiablo Son Account replied with "On here or 3143799925," indicating that FRIZIELLIE could call using the Facebook messenger service or by dialing telephone number 314-379-9925.

51.     FRIZIELLIE stated TURNER used telephone number 314-379-9925 and FRIZIELLIE contacted him on that number in the weeks prior to FRIZIELLIE's August 23, 2021 arrest. Law enforcement databases identified 314-379-9925 as a AT&T account. Text Now provided records detailing the text message and call history for FRIZIELLIE's phone number (314-476-3409) between June 1, 2021 and August 25, 2021. Of the 4,705 text messages sent and received by FRIZIELLIE's phone during that time, zero text messages were preserved with the 314-379-9925 number. Of the 374 calls placed or received during that time period, only the following four calls were made between FRIZIELLIE's phone and the 314-379-9925 phone number:

| Call Start Date/Time[2] | Call End Date/Time | Duration (seconds) | Caller | Called |
|---|---|---|---|---|
| 2021-06-27 01:56:14 | 2021-06-27 01:56:18 | 4 | 314-476-3409 | 314-379-9925 |
| 2021-07-21 22:45:19 | 2021-07-21 22:45:23 | 4 | 314-476-3409 | 314-379-9925 |

[2] The dates and times are provided in Coordinated Universal Time (UTC), which was five hours ahead of Central Time. To determine the Central Time, convert by simply subtracting five hours.

| 2021-08-06 01:56:15 | 2021-08-06 01:56:23 | 8 | 314-476-3409 | 314-379-9925 |
| 2021-08-06 02:01:05 | 2021-08-06 02:01:13 | 8 | 314-476-3409 | 314-379-9925 |

52.     Based on my training and experience with the capabilities of individuals to communicate through Facebook's Messenger service, coupled with the fact that FRIZIELLIE's phone did not contact TURNER's phone leading up to the June 14, 2021, robbery, especially when compared to the number of communications between Male Victim C.J. and FRIZIELLIE leading up to the meeting, FRIZIELLIE would have needed to communicate with TURNER through some method other than phone calls to 314-379-9925 to arrange to meet up with TURNER so that the two arrived at the Budget Inn Motel together. Although there are messages saved in FRIZIELLIE's phone between the Kaliyah Buckos Account and the Eldiablo Son Account, messages saved on FRIZIELLIE's phone may not include all messages exchanged between the Kaliyah Buckos Account and the Eldiablo Son Account.

July 31, 2021 – Carjacking in Brentwood

53.     On July 31, 2021, at approximately 12:45 a.m., a female victim reported that she traveled south on Brentwood Boulevard towards Eulalie Avenue in St. Louis County, within the Eastern District of Missouri. After the female victim observed a cat running east across the street in front of her vehicle, the female victim stopped to allow the cat to cross. After it crossed the street, the female victim pulled her vehicle over to the southeast curb of Eulalie Avenue in order to determine whether the cat had an identifiable owner. In doing so, the female victim left her vehicle and did not close the driver side door.

54.     While the female victim attempted to check on the cat, a silver sedan traveled past her vehicle and pulled to the south curb approximately 20 feet in front of her vehicle. She then observed a young black male with dreads exit the driver's side rear door of the suspect vehicle.

23

After seeing this, the female victim began running back to her vehicle. As she reached her vehicle, the black male was standing next to the open door of her vehicle. The black male produced a firearm from his waistband and pointed it at the female victim with his right hand. At this point the female victim turned around and ran. Her vehicle was described as a black 2012 Audi A4.

55.     The female victim told police her credit cards were inside the vehicle and someone attempted to use them at the Speedie Gas gas station located at 8880 N. Broadway, St. Louis, Missouri, at approximately 1:42 a.m. on the same date. Video surveillance from the Speedie Gas gas station showed the female victim's Audi at a gas pump. Two black males exit the vehicle. One entered the store to use the female victim's credit card and the other stayed by the vehicle. The surveillance camera never showed the driver exiting the female victim's vehicle.

56.     At approximately 10:26 p.m. on July 31, 2021, Missouri Highway Patrol pulled over the female victim's vehicle on I-70 and East Grand. The driver, a female approximately in her early twenties, provided a fake name and birthdate to the patrol officer and fled the stop at a high rate of speed. The identifiers provided belonged to the female driver's sister. After the female driver fled, a caller purporting to be the female driver's sister called law enforcement. The caller claimed that the female driver admitted to caller that she provided the caller's identity and fled from a stop. The female driver was identified as FRIZIELLIE, who was also identified as the caller. During that conversation, the caller (FRIZIELLIE) explained that the female driver fled because she knew that the user of the Caydo Loc Account had stolen the car that FRIZIELLIE was driving.

57.     Believing the Caydo Loc Account was associated with Cailin HOUSTON, law enforcement officers interviewed HOUSTON's mother and sister on August 5, 2021. During that

interview, HOUSTON's sister reviewed still images of the male subject using female carjacking victim's credit card. HOUSTON's sister positively identified the male as HOUSTON.

58.     During the August 24, 2021, interview with SLCPD and FBI Agents, law enforcement agents also asked FRIZIELLIE about her knowledge of the July 31, 2021, carjacking. FRIZIELLIE relayed the following information regarding the July 31, 2021, incident:

a.   On or around July 31, 2021, FRIZIELLIE, TURNER and "Cado" were in a vehicle leaving the apartment of one of Cado's girlfriends. TURNER was driving while FRIZIELLIE and Cado were in the back seat.

b.   TURNER ordered FRIZIELLIE to perform oral sex on Cado, and FRIZIELLIE complied.

c.   While driving, they noticed a black Audi on the side of the road with the door open. TURNER pulled over and Cado got out of the vehicle with a pistol and ran to the vehicle. The female victim ran back to the vehicle when she noticed Cado getting in the driver's seat.

d.   When the female victim got to the door, FRIZIELLIE saw her back away as if Cado pointed a weapon at her but did not see if Cado pointed the gun at the female victim, because the window was too tinted.

e.   FRIZIELLIE claimed she purchased the Audi from Cado after the carjacking for $250. She was later pulled over in the vehicle and gave her sister's name before fleeing. After she fled from the police FRIZIELLIE gave the vehicle back to Cado and got her money back.

59.     FRIZIELLIE was shown photographs from the video surveillance from the Speedie Gas gas station located at 8880 N. Broadway. She identified the suspect who entered the store as

25

"Cado" and the suspect standing by the pump and vehicle as TURNER. She further advised she was driving the Audi at the point the video was taken.

60.     FRIZIELLIE was shown a photograph of CAILIN HOUSTON and identified him as "Cado." FRIZIELLIE was also shown a photograph of from the Caydo Loc Account and identified it as HOUSTON's Facebook page. Within the Caydo Loc Account is a photograph of HOUSTON carrying a black gun that looks similar to a Glock.

61.     Records provided by Facebook pertaining to the Caydo Loc Account show that the three email accounts registered for the Caydo Loc Account include: houstoncailin@yahoo.com; cailin@yahoo.com; and cailinswagg@facebook.com.

August 20, 2021 – Glock 19 Firearm Theft

62.     On August 20, 2021, Victim J.T. contacted police and explained that he met up with a friend who he only knows through Facebook by her Facebook account, Kaliyah Buckos, the same account used by FRIZIELLIE. FRIZIELLIE pulled up at the restaurant in a black Mercedes, similar to the black Mercedes she drove on August 24, 2021. FRIZIELLIE, according to Victim J.T., got into the passenger seat of Victim J.T.'s vehicle. At some point, Victim J.T. exited the driver's seat and went into the restaurant. When he left his vehicle, Victim J.T. left his black Glock 19 semi-automatic pistol on the driver's side floorboard. That handgun had a light attached to the underside and an extended-capacity magazine inserted into its handle. As Victim J.T. was inside the restaurant, he observed FRIZIELLIE exit his vehicle and re-enter her vehicle and drove away. When Victim J.T. returned to his vehicle, the Glock was missing.

63.     The phone number Victim J.T. provided for FRIZIELLIE matched the phone number used by FRIZIELLIE as found during the search of her cellular phone. On August 19, 2021, at approximately 10:59 p.m., Victim J.T.'s phone number engaged in a 2 minute, 17 second

Facetime video call with FRIZIELLIE's phone. Thereafter, Victim J.T.'s phone number attempted another Facetime call with FRIZIELLIE's phone at approximately 12:14 a.m. on August 20. FRIZIELLIE's phone did not answer that call. Several seconds later, Victim J.T.'s phone number attempted another Facetime call with FRIZIELLIE's phone. Again, FRIZIELLIE's phone did not answer. More than an hour later at 1:32 a.m. on August 20, 2021, Victim J.T. texted FRIZIELLIE's phone with the message, "this wht you really want to do," followed immediately by, "i'm gone get my shit back one way or another 100." Approximately 12 minutes after that message, FRIZIELLIE's phone responded with a text at 1:45 a.m. that read, "I didNt take your gun u mad cos I wouldn't sell you shit."

64.     During this time, FRIZIELLIE's phone is also in contact with phone number 314-379-9925. At 9:07 p.m. on August 19, 2021, FRIZIELLIE's phone called phone number 314-379-9925 and the call spanned 1 minute 31 seconds. At 12:15 a.m. on August 20, 2021, FRIZIELLIE's phone called phone number 314-379-9925 and that Facetime video call spanned 7 minutes 28 seconds. At 12:24 a.m., FRIZIELLIE's phone attempted another Facetime video call to phone number 314-379-9925 that was not answered. At 12:25 a.m., FRIZIELLIE's phone called phone number 314-379-9925 and that call spanned 31 seconds. At 12:30 a.m., phone number 314-379-9925 called FRIZIELLIE's phone, but the calls were not connected. At 12:38 a.m., FRIZIELLIE's phone placed a call to phone number 314-379-9925, and that call spanned 22 seconds. At 12:38 a.m., FRIZIELLIE's phone placed another Facetime video call to phone number 314-379-9925, which spanned 4 minutes 44 seconds. At 1:04 a.m., FRIZIELLIE's phone called phone number 314-379-9925 and that call spanned 2 minutes 10 seconds. At 1:23 a.m., phone number 314-379-9925 called FRIZIELLIE's phone, and that call spanned 7 seconds.

65.     The next morning at 9:05 a.m., FRIZIELLIE's phone texted phone number 314-379-9925 requesting that the user of 314-379-9925, "Send me that video." Phone number 314-379-9925 responded at 11:03 by texting FRIZIELLIE's phone a 2 minute 53 second cellular phone video recording of an individual's hands holding a white Apple iPhone and placing a call to the phone number belonging to Victim J.T. at 1:40 a.m. A female voice asked the called male voice, "why is you sitting here calling the police on me, telling the police that I took your gun?" The male voice on the call states, "'cause you did." The female voice responded with, "but why are you calling the police on me?" After the male caller hung up, the female voice stated, "he a snitch." Based on my familiarity, training, and experience, I believe that the female caller is FRIZIELLIE utilizing another cellular phone (most likely phone number 314-379-9925's cellular phone) to video record FRIZIELLIE's call with Victim J.T. in order to document evidence of Victim J.T.'s cooperation with police regarding the investigation of FRIZIELLIE'S theft of Victim J.T.'s firearm.

66.     Additionally, in both videos recorded by FRIZIELLIE on August 23, 2021, FRIZIELLIE is holding a semi-automatic handgun with a drum-style extended-capacity magazine inserted into the magazine receiver. That handgun is consistent with the black Glock 19 stolen from Victim J.T.

August 24, 2021 – Shooting and Arrest of Turner

67.     On August 24, 2021, law enforcement responded to a shooting at the 10400 block of Prince Drive in Castle Point, Missouri. The entire length of Prince Drive in Castle Point, Missouri is approximately 0.5 miles, meaning that the shooting was no more than 0.5 miles from the address on Prince Drive that FRIZIELLIE reported "Debo" drove to following the June 14, 2021, robbery.

68.     Video surveillance capturing the area of the shooting revealed that on August 24, 2021, TURNER arrived at the shooting location on Prince Drive and exited the passenger seat of a black Ford Explorer. TURNER was armed with a baseball bat and a firearm when he walked to the passenger side of a second vehicle parked in the area. TURNER fired multiple times toward the passenger side of the second vehicle, striking the shooting victim eight times. Law enforcement recovered shell casings from the scene of the shooting.

69.     On August 25, 2021, law enforcement drove to the neighborhood that matched the address on the registration for the black Ford Explorer. There, they observed the owner of the black Ford Explorer with TURNER. Law enforcement followed the black Ford Explorer to a gas station where law enforcement observed the owner and TURNER exit the black Ford Explorer and start to enter the gas station. Law enforcement arrested TURNER for the August 24, 2021, shooting. The owner admitted to law enforcement that he was with TURNER the day before and saw TURNER fire into the second vehicle.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

70.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

71.     Based on the foregoing, I request that the Court issue the proposed search warrant.

72.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

73.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

74.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**[THIS PORTION INTENTIONALLY LEFT BLANK]**

## **REQUEST FOR SEALING**

75.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

S. Matthew Baughn
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable electronic means, in accordance with Federal Rule of Criminal Procedure 4.1, on October 1, 2021.

HON. JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

31

## <u>ATTACHMENT A</u>

**Property to Be Searched**

This warrant applies to information associated with the following Facebook user IDs:

**A.** Facebook ID 100023956283136 (URL Facebook.com/benny.low.98031) (hereinafter referred to as "Eldiablo Son Account") located at 1601 Willow Road, Menlo Park, CA 94025. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

**B.** Facebook ID 100002876094961 (URL Facebook.com/luhmella) (hereinafter referred to as "Caydo Loc Account") located at 1601 Willow Road, Menlo Park, CA 94025. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

**C.** Facebook ID 100043266096006 (URL Facebook.com/khali.buckahknot) (hereinafter referred to as "Kaliyah Buckos Account") located at 1601 Willow Road, Menlo Park, CA 94025. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2021, to September 28, 2021;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 1, 2021, to September 28, 2021, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from January 1, 2021, to September 28, 2021, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from January 1, 2021, to September 28, 2021;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2119 (carjacking); and Title 18, United States Code, Section 924(c) (use of a firearm in furtherance of a crime of violence); and Title 18, United States Code, Section 922(j) (possession of a stolen firearm that had been shipped in interstate commerce); involving DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON since January 1, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

   (a) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON pertaining to preparatory steps toward the commission of a robbery or carjacking.

   (b)  Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON pertaining to preparatory steps toward the theft of firearms.

   (c) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON pertaining to preparatory steps toward the theft of vehicles.

   (d) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON pertaining to preparatory steps toward the commission of shootings or acts of violence towards other individuals.

   (e) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON pertaining to preparatory steps toward the furtherance of prostitution or other commercial sex acts.

4

(f) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON evidencing knowledge of or participation in the commission of a robbery or carjacking.

(g) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON evidencing knowledge of or participation in the theft of firearms.

(h) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON evidencing knowledge of or participation in the theft of vehicles.

(i) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON evidencing knowledge of or participation in the commission of shootings or acts of violence towards other individuals.

(j) Communications made and received by DEMOND TURNER, KALEY FRIZIELLIE, and CAILIN HOUSTON evidencing knowledge of or participation in the furtherance of prostitution or other commercial sex acts.

(k) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(l) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(m) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

5

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____      _____
Date                                                    Signature

7